IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 12, 2020

**SUSAN JO WALLS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Bedford County**
**No. 17626PC          Forest A. Durard, Jr., Judge**

_____

**No. M2019-00809-CCA-R3-PC**

_____

The Petitioner, Susan Jo Walls, appeals the Bedford County Circuit Court's denial of her post-conviction petition, seeking relief from her convictions of first degree premeditated murder and conspiracy to commit first degree murder and resulting effective life sentence. On appeal, the Petitioner contends that she received the ineffective assistance of trial counsel. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Garrett D. Haynes, Shelbyville, Tennessee, for the appellant, Susan Jo Walls.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Robert James Carter, District Attorney General; and John Cawley and Michael David Randles, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In April 2013, the Bedford County Grand Jury indicted the Petitioner for first degree premeditated murder under a theory of criminal responsibility. The grand jury also indicted the Petitioner; her daughter, Dawn Walls; Jason Starrick; and Sean Gearhardt for conspiracy to commit first degree murder. The victim was the Petitioner's husband, Larry Walls, Sr.

The trial transcript reflects that the Petitioner was tried from May 4 to May 9, 2014, and that the State's witnesses included three of the Petitioner and the victim's four children: Larry Walls, Jr., Dawn Walls, and Aelisa Stacy. The Petitioner and the victim's oldest child, Melissa Walls, testified for the Petitioner. The following proof was presented at trial:

On August 8, 2012, Bedford County Sheriff's Deputy Tim Fox responded to a report of a theft on Enon Church Road in Bedford County. Upon his arrival, he encountered the defendant, Susan Walls, and her daughter Dawn Walls standing at the mailbox. There, he learned that the victim, Larry Walls, Sr., was inside the residence, deceased. Deputy Fox performed a cursory check of the residence and observed the victim on the floor of a bedroom. He described the scene as "pretty gruesome." Blood was on the walls, the floor, and the furniture around the victim.

Tennessee Bureau of Investigation ("TBI") Special Agent Caleb Utterback also responded to the scene in Bedford County pursuant to a request from the Bedford County District Attorney for the TBI to handle the investigation. Based upon his experience, he thought that the crime scene appeared "staged." Special Agent Utterback listened to the recording of the 9-1-1 call in his vehicle. The defendant had placed the call, but Dawn had to finish the call because the dispatcher could not understand the defendant. He agreed that the recording struck him as "odd." The call had been dispatched as a theft; neither the defendant nor Dawn conveyed any information about a deceased person at the residence. Also, Dawn gave her alibi for the day to the dispatcher, which presented a "huge red flag" to Special Agent Utterback. During the TBI's investigation, they discovered that the victim's death had been the result of a murder-for-hire. Several witnesses, including Dawn, her sisters Aelisa Stacy and Melissa Walls, her brother Larry Walls, Jr., and others, described the victim as having been an "evil man" who had been extremely physically abusive to both the defendant and their children and sexually abusive to Dawn. Over the years, many of the victim's family members had commented offhandedly that they wished he were dead but never to the point of plotting his death.

During Memorial Day Weekend 2012, the victim and the defendant traveled to Antioch, a suburb of Nashville, to spend the night at Dawn's apartment. Dawn shared the apartment with her boyfriend, Derrick McClain; her roommate, Chrissy Twilley; and Ms. Twilley's boyfriend, Jason Starrick. During the weekend, Dawn, the defendant, and Mr. Starrick discussed how

much money killing the victim would cost and various methods that could be employed.

In mid-July, the defendant visited her daughter Aelisa at the residence of Aelisa's boyfriend, Joseph Williams. The defendant had puffy eyes as though she had been crying, and it appeared to Mr. Williams that someone had struck her. The defendant told Mr. Williams that the victim had hit her, that "she was tired of it," and that it "was the last time he was ever going to hit her." The defendant remarked that "she had it taken care of and that she had some guys that was [sic] going to come down and slit his throat."

Approximately one week later, Dawn spoke with Mr. Starrick again and discussed his "tak[ing] care of [the victim]" for $400. The defendant acquiesced and told Dawn that she would pay half of the sum. A plan was formulated for Dawn and the defendant to take Aelisa and her four children to a Chuck E. Cheese's restaurant to provide an opportunity for Mr. Starrick to kill the victim at his home. The plan was discussed five or six times before it was executed.

On the night before the murder, August 7, 2012, several people were present at the home of the victim and the defendant. Dawn and the defendant had a discussion about why everyone was there. They said that the murder would occur the following day, August 8. At some point, Dawn informed Mr. Starrick that the back door of the residence was always unlocked. Dawn indicated that she wanted to take Aelisa's son to Chuck E. Cheese's because the school year would begin soon. That night, Dawn, Aelisa, Ms. Twilley, Mr. Starrick, Sean Gerheardt, and Aelisa's four children drove in two cars to Dawn's apartment in Antioch to spend the night. Everyone except Mr. Gerheardt spent the night there. Dawn paid Mr. Starrick $70 in cash and also provided him with a debit card and personal identification number so that he could purchase the necessary items to carry out the murder. The defendant did not contribute any money to Mr. Starrick.

The following morning, Mr. Gerheardt returned to the apartment, and he and Mr. Starrick left the apartment around 6:15 a.m. They used Dawn's debit card that morning at a Mapco gas station and at Walmart, where they purchased ammonia and two sets of rubber gloves. The defendant arrived at Dawn's apartment around 10:00 a.m. Mr. Gerheardt and Mr. Starrick returned thereafter; they were wearing black clothes, and Mr. Gerheardt had some blood on him. Mr. Starrick removed a long-sleeve shirt that was wet. When the two men entered the apartment, Ms. Twilley observed "tissue or

matter" on the side of Mr. Starrick's face and a bloody fingerprint on Mr. Gerheardt. They entered a bathroom, cleaned up, and exited with a plastic garbage bag. Mr. Starrick returned Dawn's debit card, and she drove to Mapco to obtain money from the teller machine to spend at Chuck E. Cheese's. When she returned from Mapco, Mr. Gerheardt and Mr. Starrick were in the parking lot placing a black trash bag into Mr. Starrick's truck. They told Dawn that "it was done." Later that day, the defendant, Dawn, Aelisa, and the children drove to Shelbyville.

When they arrived in Shelbyville, Dawn and the defendant took Aelisa and her children to Melissa's house. They had planned this in advance because the defendant did not want Aelisa and her children to see the victim or the crime scene. Dawn and the defendant went to get ice cream for all of the children from the defendant's house. When their trip took longer than expected, Aelisa called to see why they were delayed. The defendant told Aelisa what had happened to the victim.

Although the defendant and Dawn initially gave statements in which they disclaimed any involvement, they both subsequently provided statements in which they accepted responsibility and explained the events leading up to and surrounding the victim's murder. In addition to the confessions, the State's evidence at trial included forensic evidence, which matched the victim's blood with blood found on Mr. Starrick's long-sleeve shirt that was recovered from the apartment and with blood found on the belt Mr. Starrick was wearing when he was arrested. The medical examiner opined that the victim died by "multiple modality," any of which were potentially fatal and all of which contributed to his death: blunt force trauma to the head, and stab wounds to the heart, lung, and liver. Jason Starrick and Sean Gerheardt were located, with the assistance of Ms. Twilley, and arrested; the defendant and Dawn were arrested and charged with criminal responsibility for the first-degree premeditated murder of the victim and conspiring with each other, Mr. Starrick, and Mr. Gerheardt to commit said murder.

State v. Walls, 537 S.W.3d 892, 894-96 (Tenn. 2017) (footnotes omitted).

At the close of proof but prior to the trial court's instructing the jury, the Petitioner experienced a medical issue and had to be taken by ambulance to a hospital. The trial transcript reflects that the Petitioner went to the hospital at 4:04 p.m. Meanwhile, the trial court asked the State and trial counsel about "where does that leave us." The trial court reluctantly offered to instruct the jury and begin deliberations in the Petitioner's absence.

- 4 -

However, trial counsel objected to "any further action" without the Petitioner's being present and suggested that "the best thing to do would be to adjourn until tomorrow and start fresh in the morning." The State suggested "just waiting and starting deliberations at seven o'clock," noting that "it's nothing new to any of us." The trial court decided not to adjourn for the day and agreed with the State to "play it by ear for a short period of time." At some point, the Petitioner returned to the courtroom. The trial transcript reflects that the trial court instructed the jury at 6:30 p.m., that the jury began deliberating at 7:13 p.m., and that the jury asked a question at 10:41 p.m. The trial court addressed the question at 11:13 p.m. and ordered pizza for the jury, and the jury continued deliberating. The jury announced its verdict at 1:05 a.m., finding the Petitioner guilty as charged in the indictment.

The trial court sentenced the Petitioner to concurrent sentences of life for the murder conviction and twenty-one years for the conspiracy conviction. On direct appeal of her convictions to this court, the Petitioner claimed, in pertinent part, that the evidence was insufficient to support the convictions because "all evidence pointed to Dawn and only Dawn" and that the trial court erred by allowing late-night jury deliberations. State v. Susan Jo Walls, No. M2014-01972-CCA-R3-CD, 2016 WL 1409836, at *8 (Tenn. Crim. App. at Nashville Apr. 7, 2016). This court found the evidence sufficient but that the late-night deliberations warranted a new trial. Id. at *10, 14. The State appealed the trial court's ruling to our supreme court, which concluded that the Petitioner waived the late-night deliberations issue because trial counsel failed to make a contemporaneous objection and that the trial court's alleged error was not subject to plain error review due to "a lack of a clear and unequivocal rule of law concerning late night court proceedings." Walls, 537 S.W.3d at 904.

The Petitioner filed a timely pro se petition for post-conviction relief, claiming that she received the ineffective assistance of trial counsel. Relevant to this appeal, the Petitioner claimed that trial counsel failed to provide her with her case file, failed to call the witnesses on her witness list to testify, and "never brought up the abuse that she suffered so that the jury would be able to see the character of the victim." The post-conviction court appointed counsel, and counsel filed an amended petition, adding that trial counsel was ineffective because he failed to make a formal objection to the late-night deliberations, which waived the issue on direct appeal, and because he failed to communicate adequately with the Petitioner.

At the evidentiary hearing, trial counsel testified for the Petitioner that he was a self-employed attorney, that he was appointed to represent the Petitioner, and that he represented her "through General Sessions and then through Circuit and through the appellate court." The Petitioner was in jail while she was awaiting trial. Trial counsel said he visited her "a number of times through General Sessions and through Circuit Court, both

at court and in the jail." He said he did not remember the Petitioner's attempting to contact him from jail. However, if she had called him from jail, he would have been unable to return her call. Regarding discovery, trial counsel said he "would have provided her [with] a copy of her indictments and a copy of the written discovery the State provided like I do with all of my cases." The Petitioner did not request a copy of her case file until after this court or our supreme court issued its ruling. By that time, the Petitioner's file was "so large" that trial counsel told the Petitioner he would provide her file to post-conviction counsel.

Trial counsel testified that he talked with the Petitioner about the witnesses she wanted to testify at trial but that he did not remember the name "Katherine Whittaker." Trial counsel said the witnesses would have established a pattern of abuse by the victim and would have established the victim's character. Trial counsel said that "that was the only [defense] she really had" because the Petitioner "did not have an alibi defense to say she had not been involved in the planning." At trial, three of the victim's four children and two witnesses testified about the victim's abuse of the Petitioner. Therefore, trial counsel thought the additional witnesses on the Petitioner's witness list were "unnecessary." Trial counsel said that he and the Petitioner would have discussed every witness on her list and that they would have discussed not calling those witnesses to testify.

Trial counsel testified that he approached the State about a plea "[n]umerous times" but that the State never offered a sentence less than life. Trial counsel said there was "no sense" in taking a life sentence because "the worst that could happen at trial was life." Moreover, based on the victim's abuse of the Petitioner, there was a possibility "to garner some sympathy and maybe get a second degree or something lesser." The Petitioner did not have a prior record that would have warranted enhanced punishment.

Trial counsel testified that he and the Petitioner discussed the victim's abuse of the Petitioner and that some of the abuse was of "a sexual nature." The Petitioner was the only person who could testify about the sexual abuse, but she did not testify. Therefore, the sexual abuse did not "come out" at trial. Proof was presented at trial that the victim had physically abused his son, Larry, Jr.; his daughter, Dawn; and the Petitioner. Other witnesses also testified about the victim's abuse of the Petitioner and the Petitioner's children.

Trial counsel testified that on the last day of trial, the Petitioner's blood pressure "shot very high and she had to be transported to the hospital." While she was there, trial counsel questioned on the record whether the trial court should proceed with jury deliberations or adjourn for the day. The trial court decided to proceed, and trial counsel did not lodge a formal objection. When the Petitioner returned to court that evening, the trial court instructed the jury, and the jury began deliberating. Trial counsel did not make

a motion to continue the trial to the next day. He said he did not know why he did not file a motion to continue.

On cross-examination, trial counsel testified that the Petitioner was at the hospital only about one hour and that he had thought she would be there for a longer period of time. The trial court instructed the jury between 6:00 and 7:00 p.m., which he thought was not very late, and the jury began deliberating between 7:00 and 8:00 p.m. Trial counsel stated that lengthier deliberations generally were more favorable to a defendant and that he "communicated that actually several times" to the Petitioner. He acknowledged that it was trial strategy to allow the jury to continue deliberating. Trial counsel said that he argued against the late-night jury deliberations to the supreme court but that the court was "[n]ot particularly" open to stopping deliberations at a particular time.

Trial counsel testified that he spent about seven hours talking with the Petitioner in circuit court. He also spent time talking with her in general sessions court, including her preliminary hearing. Trial counsel said that the Petitioner's case was "a big case" for him and that he "spent a lot of time on it." If he had needed additional discussions with the Petitioner, he would have had them with her. Trial counsel said that he gave an "entire copy" of written discovery to the Petitioner but that he could not give her a copy of electronic discovery. However, they would have discussed electronic discovery.

On redirect-examination, trial counsel testified that he suggested the jury "start fresh" the next morning because "it was after 4:00 in the afternoon, and there was not any reason to begin deliberations at that point." Trial counsel stated that even if the trial court had continued deliberations to the next day, he did not think the outcome of the Petitioner's trial would have been different. On recross-examination, trial counsel acknowledged that after the trial, he sent letters to the jurors, asking them about the late-night deliberations. He did not receive any responses.

Upon being questioned by the trial court, trial counsel testified that the theory of defense was that the Petitioner was not involved in the plot to kill the victim. In the alternative, the defense's theory was that if the Petitioner were involved, the victim "'needed killing.'" The defense focused on Dawn and Aelisa as being primarily involved in the victim's death, and trial counsel and the Petitioner talked about that defense.

Katherine Whittaker testified for the Petitioner that she had known the Petitioner about thirty-two years. Their children grew up together, and the Petitioner's family lived near Whittaker's family. Whittaker witnessed the victim physically abuse the Petitioner. Whittaker said that one time, the victim "had [Petitioner] in the kitchen down on the table in front of the window and he was punching her in the head." Another time, Whittaker saw the victim hit the Petitioner with an orange extension cord "from their bedroom

through the trailer, back to the girls bedroom." Whittaker also saw the victim hold the Petitioner by her feet and heard the victim threaten to cut off the Petitioner's feet with a hacksaw. Whittaker said that the Petitioner was "scared to death" and that Whittaker tried to get the Petitioner to leave the victim. The Petitioner responded, "'No. You don't understand, he will kill me. He will kill my kids and then kill me.'" Whittaker went to the courthouse during the Petitioner's trial, spoke with trial counsel, and offered to testify for the Petitioner. However, trial counsel said, "They had it."

On cross-examination, Whittaker testified that the incident in the kitchen occurred about twenty-six years ago and that the incident with the extension cord occurred about twenty years ago. Whittaker said that she offered to help the Petitioner "get out of that situation" but that the Petitioner was afraid the victim would find the Petitioner. Whittaker acknowledged that the Petitioner moved out of state and away from the victim one time and that the Petitioner's family members offered to take in the Petitioner. Whittaker also acknowledged that she never contacted the police about the abuse she witnessed.

Relevant to this appeal, the Petitioner testified that she was in jail a couple of years while she was awaiting trial and that trial counsel met with her two or three times in jail. She tried to contact him several times, but he never returned her telephone calls. The Petitioner gave trial counsel a list of witnesses and told trial counsel that Katherine Whittaker could testify about specific instances of physical abuse. Whittaker was a "key" witness for the defense because she saw the victim punch the Petitioner and heard the victim threaten to cut off the Petitioner's feet with a hacksaw. However, trial counsel never talked with the Petitioner about contacting her witnesses and never gave the Petitioner a copy of the State's discovery materials. The Petitioner requested her case file from trial counsel about one year after she got to prison. She said that she never saw trial counsel object to the jury's late-night deliberations and that she thought the outcome of her trial would have been different if trial counsel had followed up on her witnesses and if the jury had not deliberated so late.

On cross-examination, the Petitioner acknowledged that trial counsel raised the issue about jury deliberations while she was at the hospital and that trial counsel told her longer jury deliberations could indicate a more favorable verdict for the defense. Larry, Jr., who was living with the Petitioner and the victim at the time of the victim's death, testified at trial about the victim's physical abuse of the Petitioner. However, he testified that he had not seen any abuse for about one year. The Petitioner said that "a lot of times [Larry, Jr.,] would come home from work and I would have a black eye or fat lip or something." Dawn also testified about the abuse. In fact, all four of the Petitioner's children testified that the victim abused her. Crystal McBride, the Petitioner's close friend, testified for the Petitioner but did not testify about any specific instances of abuse. The Petitioner said that "Dawn planned everything" and that Dawn ultimately pled guilty.

Therefore, the defense's strategy was to show that the Petitioner did not participate in the plot to kill the victim.

The post-conviction court filed an order denying the petition for post-conviction relief. Regarding the Petitioner's claim that trial counsel was ineffective for failing to object to the late-night jury deliberations, the post-conviction court noted that trial counsel testified that "the longer deliberations continued the better he felt about some favorable verdict." The post-conviction court found that trial counsel's "tactic ultimately did not work" but that trial counsel was "not ineffective for the attempt." The post-conviction court also found that the Petitioner failed to show a motion for a continuance would have affected the jury's verdicts.

Next, the post-conviction court addressed the Petitioner's claim that trial counsel failed to communicate with her adequately, failed to prepare her defense, and failed to call certain witnesses to testify. The post-conviction court implicitly accredited trial counsel's testimony that he understood the Petitioner's case and that he met with her. The post-conviction court noted that trial counsel conducted the Petitioner's preliminary hearing and that he called witnesses at trial. The post-conviction court found that "allegations of abuse by the victim upon the Petitioner were well established at trial." The post-conviction court stated that while other persons also possessed information about the abuse, the jury "had this information from the testifying witnesses." The post-conviction court noted that Katherine Whittaker admitted at the post-conviction hearing that the abuse she witnessed was "remote." Thus, the court concluded that additional information about physical abuse would not have affected the outcome of the trial.

## II. Analysis

The Petitioner contends that she received the ineffective assistance of counsel because trial counsel failed to make a formal objection to the late-night jury deliberations, which waived the issue on direct appeal of her convictions; because trial counsel failed to properly investigate the case and call Katherine Whittaker as a witness; and because trial counsel failed to communicate adequately with the Petitioner in order to prepare a defense. The State argues that the post-conviction court properly denied relief. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

First, the Petitioner contends that trial counsel was ineffective because he failed to lodge a formal objection to the jury's late-night deliberations. The Petitioner asserts that the State, not trial counsel, "suggest[ed]" at the evidentiary hearing that trial counsel's reason for not objecting was strategic. Granted, trial counsel testified on direct examination at the evidentiary hearing that he did not know why he did not make a motion to continue deliberations to the next day. However, the Petitioner testified that trial counsel told her that lengthier jury deliberations were usually favorable for the defense. In any event, even if trial counsel were deficient for not objecting or for not making a formal motion to continue, the Petitioner has failed to demonstrate prejudice. Trial counsel testified that he

- 10 -

wrote letters to the jurors to inquire about the late-night deliberations but that he got no responses. Moreover, the Petitioner did not present any evidence at the hearing to show that the late-night deliberations affected the jury's verdicts. Therefore, we conclude that the Petitioner has failed to demonstrate that she received the ineffective assistance of counsel on this issue.

Next, the Petitioner contends that trial counsel was ineffective because he did not properly investigate her case and did not call Katherine Whittaker to testify. The Petitioner claims that Whittaker's testimony was important because Whittaker would have testified about specific instances of abuse. Trial counsel testified that he spent a lot of time on the Petitioner's case, that they discussed the Petitioner's witness list, and that they would have discussed not calling those witnesses. Trial counsel also testified that numerous witnesses, including the Petitioner and the victim's own children, testified about the victim's abuse of the Petitioner. Although Whittaker could have testified about specific instances of abuse, the abuse she witnessed occurred at least twenty years before trial. As the post-conviction court noted in its order:

> The issue of abuse was well established at trial. The victim's manner of death in this case was particularly gruesome as described by the medical examiner. The murder was planned, calculated and premeditated and done in concert with other actors. It is doubtful any more of this testimony of abuse would negate an element of first degree murder. Had this been a situation where the Petitioner herself had killed the victim at or near another episode of abuse it might be more relevant.

We agree with the trial court and conclude that the Petitioner has failed to demonstrate that she was prejudiced by trial counsel's failure to call Whittaker to testify. Moreover, other than claiming Whittaker should have testified at trial, the Petitioner has not suggested what more trial counsel should have done to investigate her case or change the outcome of her trial. Accordingly, we conclude that the Petitioner is not entitled to relief on this issue.

Finally, the Petitioner contends that trial counsel was ineffective because he failed to communicate with her adequately in order to prepare a defense. In support of her argument, she refers to her evidentiary hearing testimony that trial counsel visited her in jail two or three times over the course of several years, that he never returned her telephone calls, and that she did not receive discovery. However, the trial court implicitly accredited trial counsel's testimony that he met with the Petitioner in jail and in court, that they discussed her case, and that he provided her with a copy of written discovery. The Petitioner testified at the evidentiary hearing that "Dawn planned everything"; therefore, the Petitioner's defense was that she was not involved in the plot to kill the victim. The Petitioner's testimony demonstrates that she was well-aware of trial counsel's defense

strategy and that she approved of that strategy. Accordingly, we conclude that the Petitioner has failed to demonstrate that trial counsel was deficient or that she was prejudiced by any deficiency.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE